# Exhibit 26

1                  UNITED STATE DISTRICT COURT

2                  WESTERN DISTRICT OF MICHIGAN

3

4    AMIR KHILLAH,

5                  Plaintiff,

6

7    Vs                                     Case No 1:18-cv-00696

8                                           Hon. Janet T. Neff

9

10   CITY OF KALAMAZOO,

11   A Municipal Corporation,

12

13                  Defendant.

14   _____/

15

16

17                  The deposition of KIANA GARRITY taken

18   before Patricia G. Moretti, CSR-0930, Certified Shorthand

19   Reporter and Notary Public, at Moretti Group, 471 W. South

20   Street, Suite 41B, Kalamazoo, Michigan 49007 on Friday, June

21   14, 2019 commencing at or about 12:25 p.m., pursuant to

22   notice.

23

24

25

| | | |
|---|---|---|
| 1 | | PROCEEDINGS |
| 2 | | KIANA GARRITY, |
| 3 | | having been first duly sworn, |
| 4 | | was examined and testified as follows: |
| 5 | | |
| 6 | | EXAMINATION |
| 7 | BY MR. CARLSON: | |
| 8 | Q | Could you state your full name for the record, please? |
| 9 | A | Kiana Carolyn Garrity. |
| 10 | Q | And your date of birth? |
| 11 | A | 3-19-76. |
| 12 | Q | And you are a licensed attorney in Michigan, is that correct? |
| 13 | A | Yes. |
| 14 | Q | What's your business address? |
| 15 | A | 121 West Cedar Street, Kalamazoo, Michigan, 49007, Suite 100. |
| 16 | Q | What's the name of your law practice? |
| 17 | A | Kiana Carolyn PLC. |
| 18 | Q | Is it a solo practice? |
| 19 | A | Yes. |
| 20 | Q | You don't have any partners or associates? |
| 21 | A | No. |
| 22 | Q | Any staff? |
| 23 | A | I have a gentleman that helps me occasionally but he is not a |
| 24 | | full-time staff or anything like that. |
| 25 | Q | And how long have you been in business under that PLC? |

1   A   I'm going to say around April 20, 2016.

2   Q   And when were you admitted to practice?

3   A   Sometime in May 2014, I can't remember the date.

4   Q   Where did you attend law school?

5   A   Cooley.

6   Q   What kind of cases do you handle in your practice?

7   A   Criminal, family, I have done collections and some personal

8       injury.

9   Q   What percentage is criminal work?

10  A   I would say 90, 95 percent, depending on the year.

11  Q   You represented at one time a gentleman named Jerry Jarrel

12      Joyce, is that correct?

13  A   Yes.

14  Q   Do you still represent Mr. Joyce?

15  A   No.

16  Q   Did you represent him in one single case or multiple cases?

17  A   I want to say one single case.

18  Q   My understanding is that Amir Khillah was a KDPS officer who

19      testified in a preliminary exam in Mr. Joyce's case, is that

20      correct?

21  A   Yes, that's correct.

22  Q   Did you have any other cases, criminal cases, where Amir

23      Khillah was the testifying officer?

24  A   I had a case with Arthedeus Higgins, I don't remember if we

25      ran a prelim or not.

```
1              I had a case recently where I represented somebody
2      on a PV.  He originally did the original case, which caused a
3      lot of problems because then we had to see if the PV was even
4      valid because we don't know if the conviction was even valid
5      based on Amir Khillah.  So I worked that PV out.
6   Q  And for the record, PV is?
7   A  Probation violation.
8   Q  Who is that client?
9   A  I want to say Nicholas Flegal.
10  Q  F-L --
11  A  F-L-E-G-A-L, I'm pretty sure.
12  Q  So just to better understand the context of that case,
13     Nicholas Flegal was arrested on a probation violation?
14  A  Nicholas Flegal had an underlying case where Amir Khillah was
15     involved.  Nicholas Flegal had a probation violation, he
16     retained me.  When we went to court on that, of course we had
17     the letter saying all cases with Amir Khillah, to look at
18     them, so I had to inform the court I was not the underlying
19     attorney, it was a court-appointed, so it pushed it out quite
20     sometime because the client had to get together with the
21     original attorney to review all the videos and everything to
22     see if he wanted to withdraw his plea.
23  Q  And when did those discussions happen?
24  A  This case -- I can look on my phone and tell you, this is with
25     Judge Bridenstine, we still haven't resolved the actual --
```

```
 1        let's see.
 2                 Okay.  So his arraignment, it started about -- I
 3        guess when I first met with him, so it must have been
 4        February, end of February, the last time we went to court was
 5        April 25th and we're going to court on June 20th.
 6   Q    All those dates are in 2019?
 7   A    Yes.
 8   Q    And I think you were about to say or explain that the matter
 9        has not yet been resolved?
10   A    The client has agreed that if he doesn't -- Judge Bridenstine
11        agreed it's going to be resolved June 20th, he's going to be
12        off probation and be done with no jail time.  It should be
13        whenever June 20th is, next week.
14   Q    Are the Brady issues with Amir playing into that in any way or
15        is it just the fact that --
16   A    That would be the discussion for him and his other attorney, I
17        don't know.  The judge gave him lots of adjournments and gave
18        time for him to sort that out based on the knowledge of the
19        Brady problems, I'll just leave it at that.
20   Q    It's my understanding, based on some documents we've received
21        as part of discovery in this case, as well as the deposition
22        testimony of Assistant Chief Jeff VanderWiere, that you spoke
23        with Jeff VanderWiere about the Arthedeus Higgins case, is
24        that correct?
25   A    That's correct.
```

```
 1    Q    And you also spoke with Assistant Chief VanderWiere regarding
 2         the Jerry Joyce case?
 3    A    Yes, I believe his name was Jarell, yes.
 4    Q    Sorry?
 5    A    It may be Jerry, I don't know.
 6    Q    Gerald you said?
 7    A    I think it's Jarell, not Gerald.  I can look it up.
 8    Q    So other than speaking to Assistant Chief VanderWiere
 9         regarding the Higgins matter and the Joyce matter, have you
10         spoken with VanderWiere regarding any other cases in which
11         Amir Khillah was involved?
12    A    No.
13    Q    Have you spoken with Jeff VanderWiere regarding any other
14         cases, again, other than Mr. Higgins and other than Mr. Joyce
15         in which any other KDPS officer has been involved?
16    A    Briefly about a subpoena issue and Scott Brower was aware of
17         that.  That was resolved.
18    Q    Can you tell us --
19    A    Lieutenant Smith wouldn't accept a subpoena from me and saying
20         it was the wrong procedure essentially.  So Scott Brower had
21         to get involved, I spoke with him and then I spoke with the
22         chief.  He said it was improper and we sorted it out.  That
23         was the extent of it and that was over the phone.
24    Q    So your testimony is that you spoke to Chief VanderWiere
25         regarding the Higgins matter, the Joyce matter and that Brower
```

1       subpoena matter and nothing else?

2   A   Nothing else.

3   Q   Assistant Chief VanderWiere testified that he did meet with

4       you in your office to discuss the Higgins and Joyce cases, is

5       that correct?

6   A   Yes.

7   Q   When did that meeting take place?

8   A   I honestly don't recall.

9   Q   Do you recall how long it lasted?

10  A   It was enough time for me to play the video for him so I would

11      say under 15 minutes.

12  Q   When you say the video, which video are you referring to?

13  A   There was a video that Mr. Khillah alleged my client tried to

14      run him over and if you saw the video you would see that was

15      wholly untrue, that video I played, because he didn't have

16      those videos.

17              He had the video of the -- when he testified

18      before Judge Santoni on the Joyce case and so he already had

19      that video.  He did not have the body cameras of the other

20      officers involved in the Higgins or the Joyce case, I believe

21      he didn't have any of those videos and I had all of them.  And

22      I gave him all those videos.  I didn't even give him a copy, I

23      said you can have them, when you are done, I'm done with these

24      cases, they are fine.

25  Q   Just to reset here:  You showed him the video from the Higgins

| | | |
|---|---|---|
| 1 | | case? |
| 2 | A | Yes. |
| 3 | Q | That was an MVR video originally? |
| 4 | A | I believe it was an MVR of another person at the scene, it was |
| 5 | | not Khillah's MVR. |
| 6 | Q | But it depicted Amir standing sort of beside the car when the |
| 7 | | car drove away? |
| 8 | A | In the back, yes. |
| 9 | Q | And the issue was whether the car had driven at Amir or |
| 10 | | whether it was driving away from Amir when his body makes |
| 11 | | contact with the car? |
| 12 | A | Yes. |
| 13 | Q | At that point in time you knew that Chief VanderWiere already |
| 14 | | had the body camera video and the MVR video from Amir |
| 15 | | regarding the Joyce situation? |
| 16 | A | I did not.  All he had for the Joyce case, to my knowledge, |
| 17 | | was the court video, Judge Santoni's courtroom video.  I |
| 18 | | provided him with all the Joyce stuff. |
| 19 | Q | Okay, got it.  So, when you say he had the Joyce video, you're |
| 20 | | referring to the courtroom video of the preliminary exam? |
| 21 | A | Yes. |
| 22 | Q | Got it.  He did not have the body cameras or MVRs from Amir or |
| 23 | | any other officers in Joyce, and you gave him those? |
| 24 | A | To my knowledge he did not.  I gave -- I recall giving them to |
| 25 | | him because my files are empty so I know he has them. |

1    Q    Did you give Chief VanderWiere any other materials other than
2         those videos?
3    A    I believe I gave him the videos from both files and I'm not
4         sure if I gave him some transcript notes, you know, from the
5         prelim.  Honestly I don't think so but perhaps, I don't know.
6         But he had them, he said I already have the video.
7    Q    All right.  Did you tell Chief VanderWiere that Amir was the
8         biggest liar that the department has ever had?
9    A    I don't believe so but I do believe he's a liar, evidenced by
10        my cases.
11   Q    Those being the Higgins and Joyce cases?
12   A    Yes.
13   Q    What did you tell Chief VanderWiere about Amir?
14   A    Yes.  What I told Chief VanderWiere, and I remember this
15        vividly, is that I was disgusted that he was filing a Federal
16        case alleging that he was fired because he is an Arab or
17        Middle Eastern specifically because my father, not Arab, but
18        he is Persian.
19                  So I said I was disgusted by that because this is
20        somebody who clearly lies under oath, in reports, just on my
21        experience.  I don't know about any of the other cases.  I
22        don't know about any of the other attorneys but that alone
23        should have gotten him fired.
24                  He was already fired even before the knowledge of
25        my cases so Lord only knows what they know.  That's exactly

1      what I said.  Perhaps not verbatim but I recall very much

2      being disgusted by that fact.

3  Q   That would have been the substance of what you told Chief

4      VanderWiere?

5  A   Yes.  I think I also, sorry, indicated that he is a threat to

6      real officers and their safety and you wonder why the black

7      community, which is the majority of my clients, have distrust

8      in the police, it's reasons like this.

9          I also said that KDPS should be lauded for the

10     restraint that they use in other cases I have seen where

11     people have not been shot.  I did say that because I didn't

12     want to say that, you know, you have the worst force in the

13     world.  I actually lauded them, commended them for their

14     restraint and I specifically recall saying that and that was

15     it.

16         I played the video.  He gave me a stack of cards.

17     He said other defense attorneys want to reach out to me,

18     please let them know that they can.

19 Q   Part of your job as a defense attorney in Kalamazoo is to be

20     prepared to impeach KDPS officers when they testify on the

21     stand?

22 A   Yes.

23 Q   And sometimes you can do that by pointing out lies that the

24     officers write into their reports, correct?

25 A   Yes.

1   Q    Is Amir the only officer that you have ever observed or
2        believe lied in their reports?
3   A    No.
4   Q    Who are some of the others?
5   A    I would have to look at my files but I do believe that other
6        officers have made misrepresentations.  But I will say on the
7        cases that I have when they do, the cases have been resolved,
8        dismissed or I've caught them on the record.
9            I believe that I indicated that there was once a
10       KDPS -- I can tell you this, I remember thinking, I can't
11       remember his name, he is an African/American and he was a
12       sergeant and I want to say Darrel Turner, perhaps.
13           I recall that he used excessive force and pulling
14       a gun on a case that was no more than a trespass and he was
15       the only officer that pulled a gun so I remember thinking that
16       was out of control.  But I think he has since been released.
17  Q    Was it Derrick Turner?
18  A    Turner -- African/American, he was a sergeant.  I remember
19       thinking I was surprised he was a sergeant, that's one.
20  Q    Any others that's you can recall?
21  A    Recently I had an officer on the stand that made some
22       statement that he saw my client which I knew was physically
23       impossible.  None of the officers identified my client.  He
24       swore under oath that it was on his body camera.  I got all
25       the body cameras, all the MVRs and his miraculously never

1        existed.

2                    He also stated on the record that he had reviewed

3        said body camera and it was positive that he was within 10 to

4        15 feet away from him and that he could identify my client,

5        McPherson was my client's name.  And I -- it was bound over.

6        I filed a Motion to Compel Discovery.  Judge Giguere indicated

7        that if they don't provide that video, then that officer is

8        barred from testifying.  He was the only officer indicating it

9        was my client, video never came, case was dismissed.

10                   So that's as far as that got.  I usually nip it in

11       the bud when I get it.

12   Q   Is it fair to say there are multiple other officers that you

13       have observed or caught making false statements in their

14       preliminary exam or trial testimony?

15   A   Well, this officer, the one I'm just referring to, it's hard

16       to say if that video ever existed and he reviewed it because

17       there is no trace of it.  So I can't say if he was 100 percent

18       lying.  All I know is I highly doubted that was possible he

19       saw my client.

20                   In terms of bold face lies, you know, it's hard to

21       say because when I find somebody is impeachable or untruthful,

22       I have won several prelims and I nip it in the bud there.

23                   But there are some -- I talk to hundreds of people

24       and so I talk to the people that own properties on the north

25       side and Hays Park and these areas and they tell me about

```
 1        certain officers that are doing things that I find distasteful
 2        and I don't think they are representing KDPS properly.
 3   Q    Are you aware of any officers, other than Amir Khillah, who
 4        have had Brady letters sent out?
 5   A    No, Officer Khillah was the only one that I received.  That's
 6        not to say it was other officers but just not on my case.
 7   Q    Are you privy to knowing what discipline, if any, was imposed
 8        on officers for either making misrepresentations in their
 9        reports or not testifying truthfully in cases?
10   A    No.
11             MR. CHERRY:  Objection, foundation, I don't think
12        she ever testified to that.
13   Q    Your answer is no?
14   A    I don't, no.
15             MR. CHERRY:  Objection, same.
16   Q    I've worked with criminal defense lawyers and I have done a
17        little criminal defense work and I've heard the term
18        testalying used in reference to how cops testify on the stand.
19        Is that a term that you're familiar with?
20   A    Never heard it.
21   Q    No?  It's good, you can use it.  Did you ever tell Chelsea
22        Huber that you had met with a source or a mole inside the KDPS
23        regarding officers?
24   A    No.  Can I elaborate on this?
25   Q    Sure.
```

1    A    Okay.  I had a case involving Amir Khillah's brother.  I found

2         that case very interesting because every time the star witness

3         would change his story, it was immediately after meeting with

4         John Khillah and things only John Khillah would know because

5         the evidence would come in.

6                   For example, he testified -- John Khillah gets a

7         statement from him and it says the exchange happened at the

8         Town & Country.  Well, subsequently, weeks later, John Khillah

9         gets GPS that shows it was not at the Town & Country.  And

10        then they have a conversation in the car where John Khillah

11        writes he came truthful and said he wanted to admit that it

12        really occurred at the place where the GPS indicated, at the

13        parking lot of the home, which I found very implausible.

14                  So that case would have been pushed further had it

15        not gone Federal.  But this is how it started.  So I thought

16        hmmm, that's odd.

17                  Then I hear John Khillah is under investigation.

18        I said huh, that's interesting, maybe it runs in the family.

19        So I immediately called Chelsea and I say to her if John

20        Khillah is under investigation I need to know and the judge

21        needs to know because this is an ongoing case and I know that

22        Amir Khillah is having problems.

23                  And she said -- that was just a hunch, that was

24        before the letter even came out.  And she verified yes, he is,

25        the poor guy but I don't think it's true and all of this.

1      And I said well, I just need to know about John
2   Khillah.  And she said well, I'm going to ask him, do you mind
3   if I ask him?  And I said no, ask him.  I remember exactly
4   where I was.  It was in the Calhoun County parking lot
5   waiting.
6           She calls me back and says I talked to John, he is
7   so upset.  He said he is not under investigation, he is going
8   to call the assistant chief.  I said okay.
9           She calls me and says the assistant chief denies
10  that he's under investigation and actually wants to talk to
11  you and I said okay, that's fine.
12          She said who told you this?  And I said honestly,
13  I'm not going to tell you.  And then she is like come on, who
14  is this?  Is it somebody in KVET?  She's very paranoid because
15  apparently she doesn't get along with the officers in KVET,
16  the only one she does is John Khillah.  These are her words
17  that she is having issues with people in KVET.
18          And I said I'm not telling you Chelsea because
19  honestly I don't even recall which officer told me this.  It
20  was not a mole, I don't have a mole, it's so ridiculous but if
21  she is that naive to believe that, that's on her.
22          So this is how it happened, she said Jeff is going
23  to be calling you.  Jeff never called me until months -- or
24  sometimes after because that case had already gone Federal and
25  it was sorted and that's when Jeff called me.

1                   So that's how the whole thing started because it
2          was an inquiry about a current case that I had.
3     Q    Okay.  So when Chelsea asked you who told you that John was
4          under investigation, you did not tell her that you had a
5          source or a mole?
6     A    Absolutely not.
7     Q    As you sit here today, can you recall who it was that informed
8          you that John Khillah was under investigation?
9     A    Honestly, in all truthfulness, I come in contact with officers
10         every day, almost.  They come to me with Garrity questions,
11         they come to me with family law, all sorts of cease and desist
12         requests, can you send a letter to my baby's mother, all sorts
13         of things like this.  And it was one of those officers.  I
14         don't even remember if it was somebody from KVET, KDPS,
15         township, the sheriff, I don't recall, but it really got me
16         going because that was my current case.
17    Q    Did you ever tell Chelsea Huber that you met with Jeff
18         VanderWiere on multiple occasions?
19    A    Never.
20    Q    Did you ever tell her that you met with him on cases other
21         than Higgins, Joyce or your subpoena problem?
22    A    I'm sorry, met with who?
23    Q    Chief VanderWiere.
24    A    Never.
25    Q    You never told Chelsea that?

1    A    Never.

2    Q    When is the last time you spoke with Jeff VanderWiere?

3    A    On that subpoena issue.

4    Q    That was the Brower issue?

5    A    Yes.

6    Q    And do you recall when that was?

7    A    I can look at the Email if you want.  I actually was Emailing

8         the judge's clerk and Brower was on there talking about we

9         might have a witness problem, witness being the officer, so

10        let me just look.  I think her name is Kim.

11             So this would have been on or about May 8th is

12        when I sent the Email regarding having the subpoena issue.  I

13        don't believe that the assistant chief called me that day

14        because as I recall it was a couple of days after because he

15        said I'm sorry, I didn't get your voicemail, I was in a

16        meeting.  So it might have been the 9th or the 10th of May.

17        That is the last time I spoke with him.

18   Q    Of this year?

19   A    Yes.

20   Q    In those discussions, did you discuss Amir or this case or the

21        Higgins or Joyce matters?

22   A    No.

23   Q    None of that came up?

24   A    Nothing at all.

25   Q    Are you aware of any information or do you have any knowledge

1          of Tim Mallard ever being dishonest or misrepresenting any

2          information in his reports or testimony?

3    A     Tim Mallard, I had a case with him, I don't remember -- I want

4          to say it was Kevin Martin.  Honestly, I don't know if that's

5          right.  But he made some representations about seeing the gun.

6          He went on the stand.  It was so weak it never got bound over

7          so I never dug on that one.  But that was thrown out at

8          prelim.

9    Q     When you say he made representations about seeing a gun, you

10         mean in his report?

11   A     I think on the stand he was saying something about --

12         obviously in the report he said enough for some prosecutor to

13         issue the charge.  But then when he got on the stand, you

14         know, it was perhaps more elaborate where it came out that it

15         was not possible for him to ever have seen -- never saw the

16         client with the gun.  That was one taste of what I thought of

17         him.  So he was already on my radar.

18                   Furthermore, many, many community members have

19         come up to me about Mallard that he is not a nice person, he

20         is the one that you may recall did the thing with the gun,

21         handgun, it was in the paper.

22   Q     No, I don't know about it.

23   A     He said he waved at someone, they said he was pointing a gun,

24         it was looked into, apparently found to not have merit but

25         yes.

```
 1   Q    You mean Mallard waved his gun?

 2   A    Waved his hand like I'm going to shoot you symbol and this

 3        person did intimate it and he was saying I was just saying

 4        howdy or whatever.

 5   Q    What about Nick Oliver, Officer Oliver?

 6   A    That was the one that Judge Giguere barred from testifying

 7        where he claimed he watched his body camera and saw -- it

 8        clearly depicted my client, it was impossible because they had

 9        the wrong car and the wrong person.  But I don't know if he

10        ever saw the video.  He just testified that he did and then

11        subsequently it never existed so --

12                    And I did recall bringing that up to Chelsea and

13        she said oh, well, he is trying to be in KVET and that's when

14        I said um-hmm.

15   Q    She said that in reference to Oliver?

16   A    Yes.  He is gunning for KVET, he might be aggressive,

17        something along those lines.  I make it well known, if I have

18        an issue, I'm not outspoken -- I'm not not outspoken, I should

19        say, because I take that very seriously.

20                         (Exhibit 1 marked)

21   Q    Exhibit 1 is a two-page document, Bates number Khillah 895 and

22        896.

23   A    Yes, these are the notes that I referred to that perhaps I

24        gave him notes from a transcript.

25   Q    Okay.  Yes, Chief VanderWiere testified that that's his
```

AMIR KHILLAH vs CITY OF KALAMAZOO                                      Job 9526
GARRITY, KIANA 06/14/2019                                                  22

```
 1         writing up on the top right-hand corner --
 2   A     Okay.
 3   Q     -- where he annotated that you had provided these notes.
 4   A     Yes, that's possible.
 5   Q     Okay.  And these are the notes you took prior to the Joyce
 6         preliminary exam --
 7   A     I'm going to say yes --
 8   Q     -- to prepare for it?
 9   A     -- because it's very sloppy, just like my little notes.  I
10         think the videos, there were many of them, specifically one
11         you had to wait -- mostly important was this part.
12                  "Officer recounts versions to other five cops and
13         said he made eye contact."  So he essentially never made a
14         lawful command.
15                  And he is testifying on the stand that he made a
16         lawful command but clearly in the video, I recall, he's
17         telling either the fire guy, they were standing by that gate,
18         yes.
19   Q     The lawful command issue is relevant because it's an element
20         of the offense that was charged?
21   A     Yes.
22   Q     Right?  So you had to determine whether there was sufficient
23         evidence to show that Amir actually gave your client a lawful
24         command?
25   A     Yes.  And as I recall, he also said on the stand that he gave
```

1          him a lawful command which this would belie that.

2    Q    Your notes here are your impressions as you were watching MVR

3          videos?

4    A    Yes.  I do this for most cases.

5    Q    And the first bullet under video one it says:  "Passes the

6          alleged car at 2:54:49-52"?

7    A    Yes.

8    Q    "Video does not show D."  I assume that means defendant?

9    A    Yes.

10   Q    And then it says, in parentheses, "possibly obscured"?

11   A    Yes.

12   Q    "Regardless it is dispositive demonstrating that officer

13         neither flashes his lights/siren nor even pauses his vehicle

14         whatsoever in order to give D a lawful command."

15   A    Yes.

16   Q    What did you mean by possibly obscured?

17   A    Because the officer could testify that while the video was

18         obscured you couldn't see all of what I saw, that was --

19   Q    Because he could have turned his head and seen more than what

20         might be depicted on the MVR?

21   A    No.  I think it -- passes the alleged car.  I don't see -- I

22         never saw Mr. Joyce.  When I say possibly obscured I meant

23         maybe he was on the other side of the car, maybe he was

24         ducking, not that the officer could have seen something more,

25         potentially no one could have seen any more, I always think

```
 1        But if you're saying it was April, it's possible that case was

 2        still open.  It was still open and still an active case, it

 3        had not gone Federal.  I was prepping that file.

 4   Q    Just so you know what I'm reading from, this is an Email that

 5        was marked as Exhibit 3 to Chelsea's deposition.

 6   A    Okay.

 7   Q    Chief VanderWiere wrote to John Khillah and Matthew Elzinga:

 8        "I spoke with Attorney Garrity and she would not provide the

 9        name of her source."

10             Do you recall a discussion with Chief VanderWiere

11        where he asked you the name of your source in the department?

12   A    No.  Was this in October?

13   Q    The Email is dated Wednesday, October 17th, 2018.

14   A    Honestly, I don't recall if he even asked me about a source.

15   Q    So he may have?

16   A    He may have but I'm sure I told him I don't have one, the same

17        thing I'm telling you.  Now, if Chelsea is led to believe that

18        I do, then let her think that because, you know.

19   Q    Did you tell Chief VanderWiere I don't have one and if I did,

20        I wouldn't tell you who it was.

21   A    I don't recall saying that but I didn't have a source so maybe

22        I was just playing, I don't know.  Honestly, I don't recall.

23             Now, lots of my conversations with officers are

24        protected conversations about Garrity rights, about things

25        like this.  So I would never disclose their names in that
```

```
 1    case.

 2              But honestly, officers are stupid, they talk -- I

 3    think men love to gossip more than women.  So I hear lots of

 4    stuff every week.  All I care about is the stuff that pertains

 5    to my clients.  So when I hear that John Khillah is being

 6    investigated, that clearly piques my interest.  Whether who is

 7    sleeping with who or somebody, I don't care about that unless

 8    it's affecting my clients, so --

 9              MR. CARLSON:  Off the record.

10              (Off the record)

11              MR CARLSON:  Back on the record.

12 Q  Have you ever had to reject a criminal defense client on the

13    grounds that you had previously given legal advice, Garrity

14    advice, or other assistance to one of the cops involved in

15    their cases?

16 A  No.

17 Q  Have you ever disclosed that kind of a conflict as part of

18    criminal representation?

19 A  If I had one I clearly would.  I always -- I've had

20    co-defendants wanting me to represent them and I have not been

21    able to and stuff like that.

22 Q  You see the potential for conflict, though, if you have

23    advised the officer on legal matters?

24 A  Yes.

25              MR CARLSON:  Let's just go off the record real
```

1    quick.

2                  (Off the record)

3  Q  Had you ever spoken with Chief VanderWiere before you spoke

4     with him about Amir?

5  A  Never.  To this day I have only seen him once and that was in

6     my office.  If you brought ten people in a lineup, I wouldn't

7     even be able to tell you what he looks like.

8  Q  Did you ever speak with Chief VanderWiere about Tim Mallard?

9  A  Not that I recall.

10  Q  How about Nick Oliver?

11  A  No.  That was way after, the Nick Oliver was recent, Tim

12     Mallard but I have never discussed Oliver.

13  Q  What about Officer Turner?

14  A  No.

15  Q  Did you ever tell Chelsea that you had a video or audio of an

16     officer making inappropriate comments about you?

17  A  I said a client did, yes.

18  Q  What was the nature of that discussion?

19  A  Well, Chelsea also believes, I believe, that Officer Mallard

20     is a dirty bird, her words.  So I said well, he said to a

21     client of mine that he had another officer go up to my client

22     and tell him tell your attorney she looks sexy in those boots.

23     And I actually confronted Mallard on that recently.

24  Q  You heard that secondhand from the client or you actually saw

25     a recording of it?

1   A   The client's girlfriend said they had a recording of it.

2   Q   Did you ever see that recording?

3   A   But I have no doubt in believing the client because I do have

4       very expensive boots and I do think Mallard is probably pervy.

5   Q   Who is Mallard's partner that was involved in --

6   A   I don't know because my client got arrested that night, just

7       harassed him a little bit and let him go.

8   Q   You said you have never seen the video or the audio, the

9       client's girlfriend claimed they had it?

10  A   Yes, she said she recorded it.

11  Q   When did you confront Mallard about it?

12  A   So I had a case, it went to prelim.  I was watching a video

13      with PSO Harris.  Officer Mallard comes over and injects

14      himself in our viewing of this video and he said what are you

15      watching and PSO Harris said just a video about someone lying

16      because this person lied on the stand and I used Officer

17      Harris to impeach them.

18              So, as I'm walking out, I couldn't help myself, I

19      said to Officer Mallard yes, I've got some other interesting

20      videos about you.  And he said oh, yeah, about what?  I said

21      looking sexy in those boots and he turned just white and I

22      just kept walking.

23  Q   That was the extent of that?

24  A   That was the extent of it.

25  Q   He didn't say anything about --